NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO D.A.

No. 1 CA-JV 25-0210

FILED 05-15-2026

Appeal from the Superior Court in Maricopa County
No. JS521309
The Honorable Jay M. Polk, Judge

**AFFIRMED**

COUNSEL

Ayanna A., Phoenix
*Appellant Mother*

David W. Bell, Attorney at Law, Mesa
By David W. Bell
*Counsel for Appellee Child*

Law Office of Ed Johnson, PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellee Father*

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which
Judge D. Steven Williams and Judge Veronika Fabian joined.

**K I L E Y**, Judge:

¶1        Ayanna A. ("Mother") appeals from the juvenile court's denial of her petition to terminate the parental rights of Jinelove L. ("Father") to the child they have in common. Their child, D.A., through counsel, joins in Mother's request. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to upholding the juvenile court's order denying the petition to terminate a parent's rights. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶3        While living in Texas, Mother took a trip to New York in March 2017, where she met Father. A few months later, Mother returned to New York to visit Father. The parties exchanged a series of letters and text messages afterwards.

¶4        In May 2017, Mother sent Father a letter informing him that she was pregnant. Addressing him as "love," Mother told Father,

> We're going to have a baby! I'm definitely a bit surprised but kinda suspected it since the last time we were together. Anyway, I'm excited about it and hope that you are as well!

Mother concluded the letter with, "I love you and miss you so much!"

¶5        At the end of May 2017, Mother wrote Father a letter that read in part,

> Hey love,
>
> I miss you like crazy. I just want to be around you. I don't want to go through this pregnancy without you. . . .
>
> I haven't received any letters from you since the one that was dated May 1st. I hope you're still okay.

¶6        Father evidently responded, because Mother subsequently wrote back, "That was the sweetest letter you sent to me." "You really mean a lot to me too," she added, "and of course I think about you."

¶7        D.A. was born in Texas in January 2018. Father had no contact with him that year.

¶8            In 2019, Mother petitioned for orders determining parental rights and child support. As relevant here, the Texas court designated Mother as D.A.'s primary residential parent and awarded Father parenting time "one weekend per month of [Father's] choice . . . provided that [Father] gives [Mother] fourteen days written or telephonic notice preceding a designated weekend." The court further ordered Father to pay Mother monthly child support of $450.

¶9            Father flew out from New York to visit D.A. three times in 2019. Although the record is not clear, it appears that the visits initially took place in Texas. At some point, Mother and D.A. relocated to Arizona.

¶10           In the ensuing years, Father periodically contacted Mother by text message to ask after D.A., and Father visited D.A. in person a total of seven times.

¶11           The parties' co-parenting relationship was not, however, without conflict. In June 2021, Father petitioned to enforce parenting time in New York state court, asserting that Mother had "missed" visits and "been late for pickups or drop-offs for visits." The New York court dismissed Father's petition for lack of jurisdiction.

¶12           Beginning in April 2023, Mother began to "prohibit[]" Father from seeing D.A. On five separate occasions, Father traveled to Arizona to see D.A., and Mother would not make the child available.

¶13           Although the record is not clear, it appears that in 2023 Mother and D.A. moved to a new residence in Arizona and that Mother did not inform Father of their new address. Father wrote a letter to the Federal Bureau of Investigation ("FBI") in October 2023, stating that Mother "has disappear[ed] with [his] son" and asking for assistance in locating them. An FBI representative responded with a letter declining to assist Father.

¶14           Father subsequently learned of the new address and, in May 2024, flew to Arizona unannounced to visit D.A. Mother refused to allow him to see D.A. and, shortly thereafter, petitioned for an order of protection ("OOP") asking that Father be prohibited from contacting her or their child. In her petition, Mother alleged that Father "sexually assaulted [her] the first day [she] met him," that Father has "hit" D.A., and that Father denigrates Mother in D.A.'s presence. The court issued an OOP that prohibited Father from contacting Mother except through third parties. The OOP did not, however, prohibit Father from having contact with D.A. Father contested the OOP, but the court upheld it after a hearing.

¶15        Father then filed another petition to enforce his parenting time in New York state court, which, again, was dismissed for lack of jurisdiction.

¶16        One Friday in May 2025, Father arrived in Phoenix and, through a third party, asked to see D.A. that day. He was told that Mother was too "tired" to bring D.A. to the location designated for parenting time exchanges. Father said he "didn't make it an issue" at the time because he expected to see D.A. the following day.  When Mother "[would] not allow [him] to see [D.A.]" the following day either, however, Father called the police and made a report, but to no avail. Father returned to New York on Sunday without having seen D.A. In a subsequent court filing, Mother claimed that Father had arrived in Phoenix "unexpectedly" that Friday and that she was unable to arrange for Father to see D.A. "on such short notice." She further claimed that she attempted to arrange a visit before Father returned to New York on Sunday, but that Father failed to contact her to make the necessary arrangements. "I heard nothing" from him "over the weekend," she alleged, "about a time and set place to meet[.]"

¶17        Later that month, Father filed a petition to enforce parenting time in Arizona. After an evidentiary hearing, the superior court found that Father had "not met his burden by a preponderance of the evidence" to prove a violation of parenting time orders.

¶18        In July 2025, Mother petitioned to terminate Father's parental rights to D.A. on grounds of neglect and abuse, sexual assault resulting in the child's conception, and abandonment. *See* A.R.S. § 8-533(B)(1), (2), (12). Mother alleged that termination was in D.A.'s best interests because the child would be free for adoption by Mother's husband.

¶19        In December 2025, the juvenile court held a termination adjudication hearing at which Mother and Father both testified. D.A. did not testify, but the attorney appointed for him filed a prehearing statement indicating that D.A. "is aligned with Mother's position and supports the termination action."

¶20        Mother testified that D.A. "is a result of a sexual assault" by Father. She further stated that Father "refused to have any interaction" with D.A. for a year after his birth, that she "made ample attempts to help them build a relationship[,]" and that Father "hasn't had any interaction with [D.A.] since April of 2023." Even before April 2023, Mother added, Father had not "been much involved" in D.A.'s life, asserting that Father has cited "financial hardship" as an "excuse" for his failure to exercise more than a

4

fraction of the monthly parenting time to which the Texas orders entitled him. She further asserted that Father has "hit [D.A.] as a means of discipline," which "caused [the child] anxiety" about being with Father, and that Father has "bad-mouthed" her and "tried to turn [D.A.] against [her.]" She testified that her husband has a close and loving relationship with D.A. and that her husband "intends to adopt" him.

¶21         In his testimony, Father stated that D.A. was conceived while he and Mother were "dat[ing]," that he exercised visitation "as much as [he] could" when D.A. was "one, two, three" years old, and that "things were going good" for "the first four years." He further stated that "for the past three years" he has "not been able to see" D.A. because Mother "prohibited" him from doing so. Since April 2023, he stated, he "flew" to Arizona "five times" without being "able to see him." He stated that he filed petitions to enforce parenting time in New York and "contacted the FBI" to re-establish contact with D.A., explaining, "I [didn't] know what else to do." He further testified that he has paid "child support for seven years" without "miss[ing] one payment[.]" "All I want to do," he concluded, is "spend time with my son."

¶22         Father supported his testimony with copies of the letters that Mother sent to him in 2017, photographs of himself with D.A., and a printout from the Texas Child Support Disbursement Unit showing that since 2019 he has consistently made twice-monthly child support payments totaling over $57,000.

¶23         When asked on cross-examination why he did not see D.A. for a year after his birth in 2018, Father replied, "I didn't even know she was pregnant then."

¶24         After taking the matter under advisement, the juvenile court issued a ruling denying Mother's petition to terminate Father's parental rights. The court began by stating that it had "concerns as to the credibility of both parties in this case." The court noted, for example, that Father's claim that he was unaware of Mother's pregnancy was belied by the letters Mother sent him in 2017. The court further found that, in view of the affectionate tone of those letters, Mother's testimony that Father "sexually assaulted" her was not "credible." The court further found that no "credible evidence" was presented that Father abused or neglected D.A. as those terms are statutorily defined. *See* A.R.S. § 8-201(2), (25).

¶25         The juvenile court found that Father "has not maintained a normal parental relationship with the child for a period of more than six

months" and "has not had much in way of contact . . . since 2023." The court further observed, however, "just cause" for a parent's failure to maintain a normal parent-child relationship may defeat a claim of abandonment. Referring to the conflict in the parties' testimony about the reasons for Father's failure to maintain his relationship with D.A., the court found Father's testimony "more credible and more persuasive" than Mother's. The court determined that Mother "interfered with [Father's] attempt to maintain a normal parental-child relationship with" D.A., and that Father "attempted to vigorously assert" his rights. The court therefore determined that Mother had failed to prove statutory grounds for termination by clear and convincing evidence. The court further found that Mother had failed to "present credible evidence to show by a preponderance of the evidence that termination" would be in D.A.'s best interests.

¶26        Mother and D.A. timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶27        Mother argues that the juvenile court was "wrong" to deny termination, maintaining that the court's ruling was based on "factual errors" and "misinterpret[ation]" of the evidence. D.A. asserts that Father's extended absences from D.A.'s life established a prima facie showing of abandonment, and that Father's "sporadic[] . . . attempts" to re-establish his relationship with D.A. since then did not "cure the prior abandonment[.]" D.A. further argues that the undisputed evidence that Mother's husband intends to adopt him establishes "a clear affirmative benefit to [him] if the termination petition was to be granted[.]"

¶28        Terminating parental rights "entail[s] a two-step inquiry." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149, ¶ 8 (2018). First, the party seeking termination must prove at least one statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence. *Id.* (citing A.R.S. § 8-533(B)). Second, the party seeking termination must establish, by a preponderance of the evidence, that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

¶29        A juvenile court's ruling on a termination petition will be affirmed "unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 14 (2022). Because "[t]he juvenile court . . . is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts[,]" an appellate court

"view[s] the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citation modified).

¶30        In her petition, Mother cited Father's purported abuse and neglect of D.A. as a ground for termination. *See* A.R.S. § 8-533(A)(2). In her briefing on appeal, however, Mother does not challenge the juvenile court's determination that she failed to meet her burden to justify termination on this ground. She has therefore abandoned the claim, and we need not consider it further. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 5 (App. 2017).

¶31        Mother also alleged, as a ground for termination, that Father sexually assaulted her and D.A. "was conceived as a result," *see* A.R.S. § 8-533(A)(12). At the hearing, she testified that she conceived D.A. when Father sexually assaulted her, an allegation Father denied. The juvenile court found that Mother had failed to establish this statutory ground. Mother challenges the court's determination, asserting that the court "ignored" her testimony. Not so; the court expressly considered, and rejected, her testimony on this point. In effect, Mother asks us to reweigh the parties' testimony and reach a conclusion different from the one reached by the juvenile court. We will not do so. *See In re J.C.*, 259 Ariz. 60, 68, ¶ 34 (App. 2024) ("Because the superior court is in the best position to evaluate the testimony, this court will not reweigh the evidence.").

¶32        In rejecting Mother's sexual assault allegation, the juvenile court cited the affectionate tone of the letters Mother wrote to Father in 2017. Mother argues on appeal that the court erred in making "assumptions about the way someone who has been sexually assaulted should be expected to act[.]" According to Mother, the court's ruling runs counter to *People v. Taylor*, 552 N.E.2d 131 (N.Y. 1990), which she describes as a "landmark" case holding that "expert testimony" is "allow[ed]" to "counter myths about a victim's behavior that might seem counterintuitive."

¶33        In *Taylor*, the New York Court of Appeals affirmed the admission, at a sexual assault trial, of expert testimony about "rape trauma syndrome" to explain the victim's behavior in the aftermath of the assault. *Id.* at 138. Since Mother never offered expert testimony, *Taylor* does not support her position. In any event, Mother never argued to the juvenile court that the content of the letters she sent Father in 2017 was consistent with the behavior of a sexual assault victim. Because Mother neither raised this argument at trial nor presented evidence to support it, we will not consider it for the first time on appeal. *See Kimu P. v. Ariz. Dep't of Econ. Sec.*,

218 Ariz. 39, 44, ¶ 19, n.3 (App. 2008) ("New arguments may not be raised for the first time on appeal." (citation omitted)).

¶34        Finally, Mother alleged abandonment as a ground for termination. *See* A.R.S. § 8-533(A)(1). Abandonment is the "failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8-531(1). "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." A.R.S. § 8-531(1). However, a showing of "just cause" can rebut the prima facie case of abandonment. *In re B.W.*, __ Ariz. __, 572 P.3d 88, 95, ¶ 18 (2025).

¶35        It is undisputed that Father did not exercise the monthly parenting time that the Texas court granted him. Father testified, however, that he traveled to Arizona when he was able to, that he inquired after D.A. in text messages to Mother, and that he consistently complied with his child support obligation. He further testified that he traveled to Arizona five times since April 2023 and Mother denied him access to the child each time. After hearing from both parties, the juvenile court found Father established just cause for his failure to maintain a normal relationship with the child, determining that Mother "interfered" with his ability to do so. Although Mother insists that she "has not interfered" with Father's exercise of parenting time, the juvenile court expressly found Father more credible on this point, and we defer to that court's factual findings. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002) (noting that the resolution of conflicts in the evidence "is uniquely the province of the juvenile court as the trier of fact"). The court's finding that Mother interfered with Father's relationship with D.A. supports its conclusion that Mother failed to prove abandonment under Section 8-533(A)(1). *See Calvin B. v. Brittany B.*, 232 Ariz. 292, 293, ¶ 1 (App. 2013) ("[A] parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child.").

¶36        A finding of abandonment requires an assessment of a parent's efforts to maintain his or her relationship with the child. *Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 430, ¶ 12 (App. 2023) ("When a parent cannot exercise traditional methods to bond with" a child, the parent "must act persistently to establish the relationship however possible[.]" (citation omitted)). Here, Father presented evidence that he attempted to enforce his parenting time by filing enforcement petitions in New York state court and even tried to enlist the assistance of the FBI. The juvenile court found that

while Father "may have pursued remedies in the wrong forum, or in the wrong manner," his actions demonstrate that he made efforts to maintain his relationship with D.A. Although Mother argues on appeal that Father's enforcement efforts were entitled to little weight because his "enforcement request [was] based on clearly false grounds[,]" she does not identify any false statement that Father purportedly made in his filings in New York or his communications with the FBI. Mother has therefore waived this argument by failing to sufficiently develop it. *Crystal E.*, 241 Ariz. at 577, ¶ 5.

**¶37**        D.A. argues, in his briefing, that Father's "attempts to pursue remedies in . . . incorrect forums does not overcome the prima facie case of abandonment shown by Mother[.]" But Father's lack of understanding of proper enforcement mechanisms does not refute the juvenile court's finding that he tried to enforce his rights. *In re M.L.*, No. 1 CA-JV 22-0279, 2023 WL 4633403 at *6, ¶ 34 (Ariz. App. July 20, 2023) (mem. decision) ("[I]n the face of continual and active opposition, a parent's efforts" to maintain a parent-child relationship "need not be perfect."). In any event, it is for the juvenile court, not this court, to determine the weight to be given to evidence of Father's unsuccessful enforcement efforts. *See Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510-11, ¶ 14 (App. 2008) (deferring to juvenile court's finding that father put forth "minimal at best" effort in maintaining relationship with child because "[t]he juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence" (citation omitted)).

**¶38**        Mother also argues that the juvenile court "overlooked" evidence that she made efforts to "encourage a relationship between the father and child[.]" She identifies no evidence, however, that she was unable to present at trial, and we presume that the court considered all of the evidence before it. *Fuentes v. Fuentes*, 209 Ariz. 51, 55-56, ¶ 18 (App. 2004) (stating that appellate court presumes trial court considered all evidence presented); *see also Toren C. v. Dep't of Child Safety*, No. 1 CA-JV 21-0287, 2022 WL 872834 at *6, ¶ 25 (Ariz. App. Mar. 24, 2022) (mem. decision) (rejecting mother's argument that juvenile court failed to consider child's "familial bond" with her siblings when it ordered termination of mother's parental rights, the Court "presume[d] that the juvenile court considered [this] factor" even though it "did not specifically address" it).

**¶39**        In her briefing, Mother argues that the juvenile court "stated interference according to A.R.S. § 13-1305 yet the record does not reflect such[.]" Although it is not entirely clear, Mother appears to suggest that the court improperly found that she committed the crime of access interference.

*See* A.R.S. § 13-1305 ("A person commits access interference if . . . the person knowingly engages in a pattern of behavior that prevents, obstructs or frustrates the access rights of a person who is entitled to access to a child pursuant to a court order."). If this is, in fact, Mother's argument, nothing in the record supports it. The juvenile court's ruling makes no reference to Section 13-1305, nor is a showing of a Section 13-1305 violation required to establish interference sufficient to defeat a claim of abandonment under Section 8-533(A)(1). On the contrary, a parent may defeat a claim of abandonment by showing that the other parent unreasonably interfered with his or her "opportunity and ability to develop a normal parental relationship[.]" *Calvin B.*, 232 Ariz. at 297, ¶ 21. Here, the juvenile court found that Mother did just that, and the record supports that finding. We therefore affirm the court's determination that Mother failed to prove abandonment, or any other statutory ground for termination.

**¶40**        In his briefing, D.A. argues that the court erred in determining that Mother failed to establish that termination would serve his best interests, insisting that "adoption by his step-father would be a clear benefit" to him from termination. Because we affirm the court's determination of statutory grounds for termination, we need not consider whether termination would be in D.A.'s best interests. *See In re E.C.*, __ Ariz. __, 579 P.3d 452, 458, ¶ 32 (App. 2025).

**CONCLUSION**

**¶41**        For the foregoing reasons, we affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:        JR